IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING

FILED

JUN 27 2022

U.S. DISTRICT COURT-WVND
WHEELING, WV 26003

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CRIM. ACTION NO.: 5:22CR6 (BAILEY) |
| DEONTE RAYMOND JAMES, | |
| Defendant. | |

## REPORT AND RECOMMENDATION

Currently pending before the undersigned on referral from the District Court is Defendant's Motion [35] to Suppress Evidence. Defendant's Motion is fully briefed, and a hearing was held on June 9, 2022. At the hearing, Defendant sought leave to file a supplemental brief approximately one week after the hearing. Leave was granted. On June 15, 2022, Defendant filed his supplemental brief. After considering the parties' briefs, the applicable law, and the Court file, and after considering the evidence submitted during the June 9, 2022, hearing, the undersigned would recommend that Defendant's Motion be denied.

### I.
### FACTUAL/PROCEDURAL HISTORY

On February 1, 2022, Defendant was indicted on one count of Possession with Intent to Distribute Methamphetamine and one count of Unlawful Possession of a Firearm. ECF No. 1. The Indictment arises out of an encounter with Moundsville Police Officers which occurred on January 20, 2022. Defendant's Motion seeks to suppress both the methamphetamine and the firearm which form the basis of the instant Indictment.

Sgt. Shilling and Corporal Geary of the Moundsville Police Department testified during the June 9, 2022, hearing. Sgt. Shilling's body camera video and the police report were admitted into evidence. A summary of this evidence is set forth below.

A.  **Sgt. Shilling's Testimony**

Sgt. Shilling was on duty on January 20, 2022, at approximately 2:40 a.m. when he was notified by dispatch of a disturbance in the alley between Third and Fourth Street, and Grant Avenue in Moundsville, WV. Dispatch advised that two persons inside of a vehicle were arguing. Sgt. Shilling noted that a noise ordinance is in place in Moundville, which makes it a crime (a misdemeanor) to argue or argue loudly.[1]

Sgt. Shilling responded to the location (noted in the police report as the alley behind 1209 3rd Street) in his vehicle. Corporal Roar and Patrolman Geary also responded to the location in separate vehicles. All officers were wearing uniforms and all the officers were driving marked police cruisers. The officers parked their cruisers so that Defendant could not move his vehicle; that is, the entrance/exit from the alley was blocked. Sgt. Shilling agreed that, at this point, Defendant was detained.

Defendant's vehicle was running when Sgt. Shilling arrived. The vehicle was parked in front of a garage, which is next to or in the close vicinity of the apartment at which back-seat passenger, Amy Burgy, was staying. The front-seat passenger was identified as Matthew Marczak. The vehicle was partially obstructing the roadway. A lot of drug activity occurs in and around the garage apartment (Ms. Burgy's apartment) adjacent to the garage where Defendant's vehicle was

---

[1] Though Sgt. Shilling does not specifically cite the section, the noise ordinance to which Sgt. Shilling seems to refer is codified in the Moundsville City Code at Article 527

2

parked. Sgt. Shilling and the Drug Task Force have made multiple visits to Ms. Burgy's apartment. These circumstances appeared suspicious to Sgt. Shilling.

As Sgt. Shilling approached the vehicle, he saw no signs of a disturbance. Further, there was no evidence of drug or alcohol use. No one was acting erratically. There were no signs that any of the passengers were going to take off running. No one resisted police presence. Sgt. Shilling asked Defendant for identification to investigate the disturbance call and to ensure, in the case someone had to drive away from the scene, that person had a valid driver's license. Defendant did not have physical identification. Mr. Marczak did have physical identification, which he provided. Ms. Burgy did not have physical identification but provided her name. Officers were able to verify the identity of Mr. Marczak and Ms. Burgy.

Defendant stated that Ms. Burgy had gotten rid of a safe which contained Defendant's things and they were discussing it. According to Sgt. Shilling, this statement confirmed the disturbance reported to dispatch. Sgt. Shilling acknowledged the possibility that Defendant was the victim of a petit larceny or grand larceny.

Defendant provided the name Deon Squire and a date of birth (3/4/1987) to Sgt. Shilling. Defendant had an Ohio ID, so Sgt. Shilling asked for a middle initial (which is required to search Ohio identification records). Defendant provided the middle initial "R."

Dispatch could not confirm Defendant's identity with the name and date of birth provided. Sgt. Shilling asked Defendant to spell out his name, which Defendant did. Dispatch still could not confirm Defendant's identity.[2] Believing Defendant was giving them a false name and lying about who he was, officers decided to arrest him for Obstructing an Officer.[3]

---

[2] At some point, Defendant provided the middle name of 'Raymond,' but dispatch still could not confirm Defendant's identity. It is unclear from Sgt. Shilling's testimony when this occurred.

[3] W. Va. Code § 61-5-17(a), per the Police Report. According to Sgt. Shilling, Defendant's provision of a false name is the basis for the charge of Obstructing an Officer.

3

Patrolman Geary asked Defendant to step out of the car. Defendant ignored him. At that time, Defendant was talking on the phone. Sgt. Shilling moved to the front of the vehicle and told Defendant to get out of the vehicle. Patrolman Geary also asked again and opened the driver's side door. As Patrolman Geary opened the driver's side door, Sgt. Shilling saw Defendant move his hand to his right side. Sgt. Shilling instructed Defendant not to reach there. As Patrolman Geary reached into the car to extract the Defendant, Defendant again moved his hand to his right side. Sgt. Shilling again instructed Defendant not to reach there. Officers saw a firearm on Defendant's right hip. They retrieved the firearm from Defendant.

Defendant was compliant and cooperative as he was put into handcuffs. Defendant was placed under arrest for Obstructing an Officer for giving a false name. After he was arrested, Defendant was searched. Officers found a holster for another firearm (the firearm was located in the vehicle) and a fanny pack with a large amount of cash and crystal methamphetamine. Once Officers were advised of Defendant's real name, they determined that Defendant was a convicted felon. After Defendant was arrested, he provided his real name.

B.     **Police Report**

Officer Peyton Geary prepared the police report from this event. According to the report, the Moundsville Police Department received a call at 2:42 a.m. on January 20, 2022, from someone named 'Michael' advising of a disturbance in the alley behind 1209 3rd Street, in a black car. A Black male and a White male were identified as the two individuals involved in the disturbance. Sgt. Shilling, Cpl. Roar, and PFC Geary responded to the call.

Upon arriving in the alley, officers located a black Hyundai Elantra with West Virginia Registration 32U434. The vehicle was running with its lights on, parked behind a garage. Three individuals were inside the vehicle. Sgt. Shilling spoke with the front seat passenger, who

identified himself as Matthew Marczak. Sgt. Shilling also spoke with the driver who identified himself as Deon Raemon Squire. Officer Geary spoke with the back seat passenger who identified herself as Amy Burgy.

Dispatch advised that they were unable to locate an identification for the driver with the name provided. Sgt. Shilling asked the driver again for his name, and the driver advised that his last name was 'James.'[4] Dispatch was again unable to identify Defendant. At that point, Sgt. Shilling asked the driver to step out of the vehicle, but Defendant did not move. Sgt. Shilling again instructed Defendant to step out of the vehicle, but again Defendant did not move. Sgt. Shilling went around the front of the vehicle to the driver's side, and Officer Geary went to the driver's side door and knocked on the window so that the Defendant would exit the vehicle. Defendant again did not move to open the door. Officer Geary opened the driver's side door. At that point, Defendant began to reach with his right hand down toward his side hip area. Sgt. Shilling drew his firearm and ordered the male to stop reaching and to get out of the vehicle. Officer Geary took control of the Defendant's right arm while Defendant was still seated in the vehicle with his legs out of the vehicle. Sgt. Shilling observed the butt end of a firearm on Defendant's right hip inside of a holster which was sticking out from under his jacket and pants. Defendant exited the vehicle. Officer Geary placed him under arrest for Obstructing an Officer.

A search incident to arrest revealed 2 additional gun holsters, crystal methamphetamine, pills, and a large amount of money. Sgt. Shilling asked dispatch to run the firearm, a Lorcin .380 caliber black and silver automatic handgun (SN# 343773). The 6-round magazine contained 5

---

[4] Sgt. Shilling's testimony contradicts this. According to Sgt. Shilling, Defendant did not provide his correct last name prior to arrest.

rounds of .380 caliber ammunition. Sgt. Shilling also searched the vehicle and located a black Ruger Blackhawk .357 caliber (SN# 520-07337) in the center console.

Defendant was placed in the rear of Officer Geary's vehicle and advised of his Miranda rights. Officer Geary asked Defendant if he would answer questions. Defendant stated that he would. Defendant advised that his name was Deonte Raymond James and that his Ohio ID was RP935116. Dispatch was able to successfully locate an identification for Defendant. Defendant was transported to Moundsville Police Department for processing.

Cpl. Roar processed the evidence found on Defendant: 170g (6oz) of a white/powder substance, identified as Methamphetamine; 12 oval shaped pills white in color with the imprint "IP 110," identified as Hydrocodone Bitartrate, 325 mg; $930.00 in cash. A review of Defendant's criminal history revealed that he was convicted on November 13, 2017, of a felony for Menacing by stalking engaging in a patter[n] of conduct.[5]

### C. Officer Geary's Testimony

On January 20, 2022, Officer Geary responded with Sgt. Shilling to the scene of this encounter. At approximately 5:02 a.m. on January 20, 2022, Officer Geary prepared the police report from the call. He was unable to review any body camera video before making the report.

Until the point in time when officers decided to pull Defendant out of the car, Officer Geary did not hear Defendant give the last name of 'James.' The reference to Defendant giving the last name 'James' in the third paragraph of the police report is not a correct statement. The report is also inaccurate insofar as it indicates that dispatch searched the name 'James' and was unable to locate an identification for Defendant.

---

[5] The police report does not specify the State of conviction.

6

After reviewing the body camera video, Officer Geary confirms that Defendant did not say the name 'James' prior to exiting the vehicle.

D.   **Sgt. Shilling's Body Camera**

At approximately 2:39:34 a.m. on January 20, 2022, Sgt. Shilling approaches the vehicle in which Defendant is located and asked why the occupants were making a disturbance. The rear seat female passenger (Amy Burgy) can be heard saying that they are just sitting there talking. Sgt. Shilling advises the occupants that officers received multiple calls for disturbance and asks if anyone had identification.

At 2:39:57 a.m., Defendant states that he does not have an ID. Defendant leans across the driver's compartment to speak to Sgt. Shilling (who is stationed at the passenger side of the vehicle) and offers to provide something (it is inaudible on the video). Sgt. Shilling tells Defendant to "hold on," and then asks what they are doing "back here." Defendant replies "we are having a small issue because I left some belongings here…(inaudible)…as a *woman* (emphasis in Defendant's voice) decided she was going to take my safe…it had some really precious things in it and destroy it." Sgt. Shilling asks Defendant for his name. Defendant replies that his name is Deon Squire (Defendant spells his name for Sgt. Shilling). Defendant also provides a birth date: 3-4-87. In response to Sgt. Shilling's question of whether Defendant has a West Virginia ID, Defendant states that he is "located in Ohio." Sgt. Shilling asks him for a middle initial, which Defendant provides as "R." Sgt. Shilling asks again what they are doing "back here." Defendant replies that she (meaning Ms. Burgy) stays "right here." Defendant says he just came to get his belongings, and that there were some really important things in there.

At approximately 2:41:15 a.m., Sgt. Shilling contacts dispatch and begins providing information for identification. Defendant leans across the passenger compartment and continues

speaking to Sgt. Shilling as Sgt. Shilling reports information to dispatch. At 2:41:40 a.m., Sgt. Shilling provides Defendant's name, middle initial, and birthdate to dispatch. At approximately 2:43:25 a.m., Sgt. Shilling asks Defendant what they were arguing about. Defendant denies that it was an argument. He says he has every right to be upset but denies screaming. He says he is emotional about his safe.

At approximately 2:45:08 a.m., Sgt. Shilling asks Defendant for his middle name, which Defendant states is "Raemon." Defendant spells the name for Sgt. Shilling. Sgt. Shilling provides the name, including spelling, for dispatch.

At approximately 2:46:08 a.m., after being advised by dispatch that they could not locate or confirm Defendant's identity, officers asked Defendant to step out of the vehicle. Defendant does not comply. They ask again. Defendant does not comply. Officers instruct Defendant to stop reaching to his right side. Officer Geary then opens the driver's side door and helps Defendant out of the vehicle. Officers ask Defendant approximately three (3) times what he has on him. Defendant does not answer. At approximately 2:46:42 a.m., as Defendant is turning to get out of the vehicle, officers see a firearm on Defendant's right side/hip area. At approximately 2:46:57 a.m., Defendant is handcuffed and placed under arrest.

## II.
## ARGUMENTS OF THE PARTIES

### A. Defendant's Arguments

Defendant argues that, upon arriving at the scene, and because there was no evidence of a disturbance or any illegal activity, officers should not have engaged with Defendant and should not have asked him for his name. Defendant maintains that officers unreasonably extended the stop, and that asking Defendant for his name was inappropriate and illegal.

Defendant further contends that he did not commit the offense of obstruction because provision of his name is not required under the West Virginia Obstruction statute. Therefore, and because Defendant did not commit the offense of Obstructing an Officer, Defendant maintains that the search of his person was improper and should be suppressed.

### B. Government's Arguments

The Government argues that officers' encounter with Defendant and the subject vehicle was proper because officers were investigating a disturbance call. The Government further contends that continued investigation of Defendant was justified because Defendant provided a false name to officers. Finally, the Government argues that the search of Defendant's person was valid pursuant to a lawful arrest.

### III.
### STANDARD

The burden of proof for a Motion to Suppress is on the party seeking to suppress the evidence. *United States v. Gualtero*, 62 F.Supp.3d 479, 482 (E.D. Va. 2014) ("[t]he legal standards governing a motion to suppress are clear....[t]he burden of proof is on the party who seeks to suppress the evidence") (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981)). Once the defendant establishes a basis for his Motion, the burden shifts to the Government to prove by a preponderance of the evidence that the challenged evidence is admissible. *Id.* (citing *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974) ("the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence").

With these standards in mind, the undersigned will turn to the substance of the parties' arguments.

# IV.
# DISCUSSION

Initially, the undersigned would note that Defendant does not challenge the call from "Michael" reporting a disturbance in Defendant's vehicle in the alley behind 1209 3rd Street in Moundsville, WV. Thus, and consistent with Defendant's arguments, the undersigned will confine this opinion to the interaction between officers and the occupants of Defendant's vehicle; that is, from the time Sgt. Shilling approached the vehicle at approximately 2:39:34 a.m. until Defendant's arrest.

The Fourth Amendment protects persons against "unreasonable searches and seizures." U.S. CONST. amend. IV. These protections extend to "brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981); *Terry v. Ohio*, 392 U.S 1, 9 (1968)). "[P]olice can stop and briefly detain a person for investigative purposes if they have a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if they lack probable cause under the Fourth Amendment." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Sgt. Shilling acknowledged during his testimony that, upon officers' arrival, Defendant and the occupants of the vehicle were detained. That is, they were not free to leave the area. They were not, however, under arrest.

To justify an investigatory stop, law enforcement "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion [created by an investigatory stop]." *United States v. McBride*, 676 F.3d 385, 391 (4th Cir. 2012) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "This suspicion must be based on more than an officer's hunch, but reasonable suspicion is less than probable cause." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). "[B]ecause the intrusion created by an investigatory

10

stop is minimal, the reasonable suspicion standard is set fairly low." *Avagyan*, 164 F.Supp.3d 864, 882 (E.D. Va. 2016) (citing *United States v. Glover*, 662 F.3d 694, 698-700 (4th Cir. 2011)).

"The concept of reasonable suspicion, like probable cause, is not readily, or even usefully reduced to a neat set of legal rules." *Sokolow*, 490 U.S. at 7 (internal quotations omitted). "In evaluating the validity of [an investigatory stop], [Courts] must consider the totality of the circumstances." *Id.* at 7-8 (internal quotations omitted) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Here, the totality of the circumstances demonstrates that: (1) officers had reasonable suspicion to investigate the disturbance call by asking for the names of the vehicle's occupants; (2) officers had reasonable suspicion to continue the stop to confirm Defendant's identity; and (3) Defendant was searched pursuant to a lawful arrest for the crime of Obstruction.

**A. Sgt. Shilling was permitted to ask for Defendant's name because reasonable suspicion existed that criminal activity was afoot when Sgt. Shilling approached Defendant's vehicle.**

In the instant case, Defendant argues that Sgt. Shilling should not have asked for Defendant's name and/or identification because there was no disturbance. Without a disturbance, there is no crime. Without a crime, there is no reasonable suspicion to investigate. Defendant maintains that, once officers arrived on the scene, the call should have ended. The undersigned is not persuaded by this argument. To decide against further investigation, the officers would have had to disregard the claims of the caller, Michael, who reported the disturbance. Simply because officers did not see any outward, obvious signs of a disturbance from the occupants of the vehicle upon arrival on scene, however, does not mean that officers' decision to investigate the disturbance call was unreasonable. As Sgt. Shilling testified, disturbances often subside when the parties involved see officers arrive. The fact that Sgt. Shilling did not see any obvious signs of a disturbance, therefore, does not, in and of itself, neutralize the report of a disturbance in the alley.

Although Defendant does not challenge Michael's report of a disturbance, Defendant's argument nevertheless compels the Court to discuss Michael's report and the inferences that can be drawn therefrom. Michael called the Moundsville Police at approximately 2:40 a.m., which is in the middle of the night, and advised that the Black male occupant and the White male occupant of a black car were arguing in the alley behind 1209 3rd Street. Given the late hour, it would have been reasonable for officers to conclude that Michael was in his home when he reported the disturbance, and possibly sleeping when the disturbance awoke him – the implication being that this was a loud argument that Michael reported to police. As Sgt. Shilling noted, a loud argument is a crime under the Moundsville City Code. The reasonable inference from Michael's unchallenged report, therefore, is that a crime was occurring at the time he called police.[6]

Even if the disturbance had resolved on its own (and independent of police presence) before officers arrived on scene, this fact would not necessarily mean that officers no longer had reasonable suspicion to investigate the disturbance call. Officers are not obligated to 'catch someone in the act' to substantiate reasonable suspicion. Rather, officers can have reasonable suspicion that a person has been, is, or is about to be engaged in criminal activity. *See U.S. v. Cortez*, 449 U.S. 411, 695 (1981); *Brown v. Texas*, 443 U.S. 47, 51 (1979); and *Terry v. Ohio*, 392 U.S. 1, 16-19 (1968). Here, officers had reasonable suspicion that criminal activity had occurred based on Michael's phone call. Additionally, and given Sgt. Shilling's acknowledgement that disturbances often resolve when police arrive, it would have been reasonable for officers to believe

---

[6] Article 527.01 of the Moundsville City Code prohibits any loud noise which disturbs the peace of others within the City. Article 527.02(b) specifically identifies yelling and shouting, particularly between the hours of 11:00 p.m. and 7:00 a.m., or at any time which disturbs persons in any dwelling or other type of residence, or persons in the vicinity. The disturbance reported by Michael as coming from Defendant's vehicle on the night in question falls squarely within these parameters.

that the disturbance could possibly re-occur if officers left the premises without investigating the original call further.

Defendant argues that there is nothing unusual about sitting in a parked vehicle in front of one's home at night. ECF No. 44 at p. 4, ¶ 7. In support of this argument, Defendant relies upon *Wingate v. Fulford*, 987 F.3d 299 (4th Cir. 2021), which acknowledged that "there is nothing inherently suspicious about driving at night on an interstate highway." *Id.* at 306 (quoting *United States v. Williams*, 808 F.3d 238, 248 (4th Cir. 2015)). *Wingate*[7] is inapposite to the case at bar, however. The only two factors the instant case has in common with *Wingate* are the time of day (or night) and the involvement of a vehicle. The cases differ considerably beyond that.

In *Wingate*, Deputy Fulford came upon Mr. Wingate's vehicle by happenstance. Here, officers responded to the subject vehicle because of the report of criminal activity, i.e. the disturbance. In *Wingate*, Mr. Wingate had been traveling on an open roadway when he was forced to stop his vehicle due to engine trouble. Here, Defendant was in a parked, albeit running, car in an alley reportedly arguing with at least one other occupant. In *Wingate*, Deputy Fulford demanded that Mr. Wingate identify himself. Here, Sgt. Shilling asked the occupants of the

---

[7] In *Wingate*, Mr. Wingate was driving on Jefferson Davis Highway in Stafford County, Virginia between 1:00 a.m. and 2:00 a.m. when his check-engine light came on. He pulled off to the side of the road and parked to investigate. He parked in front of CarStar car dealership under an illuminated streetlight. He left his lights on and opened the hood. Mr. Wingate was a former mechanic. *Wingate*, 987 F.3d at 303.

Deputy Fulford was driving northbound on Jefferson David Highway at the same time and saw Mr. Wingate's vehicle. Deputy Fulford stopped to assist. Upon seeing Deputy Fulford, Mr. Wingate exited his vehicle and began walking toward Deputy Fulford. Deputy Fulford asked what was going on and Mr. Wingate advised that he was driving to his girlfriend's house but ran into car trouble. Deputy Fulford asked for Mr. Wingate's identification. Mr. Wingate questioned Deputy Fulford's need for identification. Deputy Fulford advised that Mr. Wingate's identification was required. Eventually, Deputy Fulford told Mr. Wingate that he would not be free to leave unless and until Mr. Wingate identified himself. Mr. Wingate continued to refuse. Officers attempted to arrest him, but Mr. Wingate fled. The arrest was ultimately completed, and Mr. Wingate was charged with failing to identify himself, intentionally preventing a law enforcement officer from lawfully arresting him, knowingly attempting to intimidate or impede a law enforcement official, and possession an open certificate of title. *Id.* at 303-304.

vehicle for identification. In *Wingate*, Mr. Wingate asked Deputy Fulford why his identity was required. Here, Defendant provided a false name – twice.

Notwithstanding, and more to the point of Defendant's position, Defendant was not sitting in front of his own home at night. He was in a parked, running car in an alley near someone else's home at 2:40 a.m., the vehicle was partially obstructing the alley, and he was reportedly arguing, quite loudly, with someone else in the vehicle. There *is* something inherently suspicious about this scenario. Why were the occupants sitting in a running vehicle at 2:40 a.m.? If they were so close to an occupant's residence, why were they not in the residence? Did the fact that they were not in the residence have something to do with the argument? Why were they arguing (so loudly)? These are the questions which would likely and reasonably have been in officers' minds as they approached the vehicle. The totality of the circumstances supports these suspicions.

Finally, it bears mentioning that the nature of the intrusion here is minimal, at best. After officers asked why the occupants of the subject vehicle were making a disturbance, they asked the occupants for identification. They did not *require* identification. Rather, they accepted the simple representation of a name from at least one of the occupants of the vehicle. The exchange between officers and the vehicle's occupants lasted approximately eight (8) minutes according to the body camera video, and approximately six (6) minutes of that exchange is the result of Defendant giving Sgt. Shilling a false name.

B. **Reasonable suspicion justified Officers' continued detention of Defendant when they could not confirm his identity.**

Defendant next contends that the continued detention of Defendant to determine his name was unjustified and illegal under the circumstances. The undersigned is not persuaded by this argument. As Sgt. Shilling testified, when a person provides a false or fake name to officers in the course of an investigation, suspicions are raised that the person is hiding something, usually

14

evidence of criminal activity. When considering this testimony in conjunction with the fact of the disturbance call, the late hour, and the fact that, when the fake name was given, officers were at or near an apartment with a high incidence of drug traffic and the fact that Amy Burgy (the resident of the high drug-activity apartment) was in the vehicle, and given Defendant's admission that he had been arguing with the other occupants of the vehicle, the undersigned would conclude that officers were justified in continuing to extend the stop to confirm Defendant's identity. Under these circumstances, it would have been reasonable for officers to believe that Defendant was attempting to conceal his real identity to hide potential criminal activity.

Defendant argues that he was not obligated to provide his name to officers, and that his refusal to give his name was not a crime. However, Defendant did not refuse to provide his name or remain silent when his name was requested. Rather, Defendant provided a fake name to officers – not once, but twice. Defendant even went so far as to spell the fake name for officers to "assist" them. Such action reasonably indicates that Defendant did not want officers to find his real identity and supports the conclusion that Defendant actively took steps to thwart officers' investigation into the disturbance call.

Finally, the evidence is clear that, while Sgt. Shilling extended the stop to determine Defendant's identity, Sgt. Shilling did not inquire about any topic outside of the disturbance (he asked multiple times why the occupants were arguing), and the names of the occupants of the vehicle. Again, the exchange between officers and the vehicle's occupants lasted approximately eight (8) minutes according to the body camera video, and approximately six (6) minutes of that exchange is the result of Defendant giving Sgt. Shilling a false name.

## C. The search of Defendant's person was proper as a lawful search incident to arrest.

Defendant argues that the search of his person was not proper because he did not commit the offense of Obstruction. Thus, because he was not lawfully arrested, Defendant could not have been lawfully searched. In making this argument, Defendant relies primarily upon *State of West Virginia v. Srnsky*, 213 W.Va. 412, 582 S.E.2d 859 (2003), and in particular, the Court's statement that "not every act of questioning the authority of a police officer constitutes obstruction." *Srnsky*, 582 S.E.2d at 868. Defendant also relies upon the following passage:

> The charge of obstructing an officer may be substantiated when a citizen does not supply identification when required to do so by express statutory direction or when the refusal occurs after a law enforcement officer has communicated the reason why the citizen's name is being sought in relation to the officer's official duties.

*Id.* Defendant argues that, because provision of a name is not required under the Obstruction statute, Defendant could not have committed the offense of Obstruction. This argument is not persuasive.

Defendant did not question Sgt. Shilling's authority as a police officer, and Defendant did not refuse to give his name, as Mr. Srnsky did. *Srnsky*, 213 W.Va. at 421. Rather, Defendant provided a false name to Sgt. Shilling - twice. Defendant even went so far as to spell his "name" for Sgt. Shilling in an attempt to "help" Sgt. Shilling, while seemingly knowing that the name(s) he provided was not in fact his legal name. Upon realizing that Defendant provided a false name, it was reasonable for officers to conclude that Defendant was trying to conceal his identity and thus interfere in officers' attempts to investigate the disturbance call. Such activity falls squarely within West Virginia's Obstruction statute, which provides that "[a] person who…acts…or obstructs or attempts to hinder or obstruct a law-enforcement officer…acting in his or her official capacity is guilty of a misdemeanor." W.Va. Code § 61-5-17(a).

Defendant also argues that, pursuant to *Srnsky*, he cannot lawfully be charged with Obstruction because Sgt. Shilling did not make Defendant aware of why Sgt. Shilling sought Defendant's name. Defendant maintains that the first thing Sgt. Shilling did upon approaching Defendant was to demand identification. Defendant contends that Sgt. Shilling failed to advise Defendant of why Defendant's identification was needed. These factual assertions are incorrect. A review of Sgt. Shilling's body camera makes clear that, upon approach to the subject vehicle, Sgt. Shilling asks the occupants "What's going on guys? What are you guys out here making a disturbance for? We got multiple calls on you guys. You guys got IDs?" ECF No. 40-1. Sgt. Shilling's first statements alert the occupants of the vehicle that he is investigating a call about a disturbance from their vehicle. He then asks for identification. The sequence of Sgt. Shilling's statements clearly connects his desire for their identification to his investigation of the disturbance emanating from their vehicle. Accordingly, Sgt. Shilling did advise the occupants of the vehicle, including Defendant, why he was seeking their identification. The undersigned would therefore conclude that Defendant's arrest for Obstruction was valid. As a result, the search of Defendant's person was conducted incident to lawful arrest.

## V.
## CONCLUSION

The undersigned would therefore conclude that Defendant has not met his burden of proving that the evidence in question should be suppressed. The Government has established by a preponderance of the evidence that the evidence in question is admissible. Accordingly, and for all of the foregoing reasons, the undersigned would **RECOMMEND** that Defendant's Motion [35] to Suppress Evidence should be **DENIED**.

Any party who appears *pro se* and any counsel of record, as applicable, may, within **fourteen (14) days** after being served with a copy of this Report and Recommendation file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to parties who appear pro se and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia, to the United States Marshals Service and to the United States Probation Office.

Dated: 6-27-22

JAMES P. MAZZONE
UNITED STATES MAGISTRATE JUDGE